# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ATTORNEY GENERAL DANA NESSEL, | CASE NO. 2:25-CV-11221-SJM-CI |
| Plaintiff, | Hon. Stephen J. Murphy, III |
| v. | |
| ROKU, INC., | |
| Defendant. | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO ROKU'S MOTION TO DISMISS

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED............................................................. iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES .......................... v

INTRODUCTION AND FACTUAL BACKGROUND ....................................... 1

ARGUMENT...................................................................................................... 2

I.     The Relationship Between *Parens Patriae* and Article III Standing .......... 2

II.    The Attorney General Has Article III Standing.......................................... 6

   A.  Standing Based Upon Quasi-Sovereign Interests ........................................ 7

   B.  Standing Based Upon Sovereign Interest ...................................................11

III.   Statutory Authority to Bring Suit ..............................................................13

CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982)...........................................................................v, 8, 10, 12

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022)....................................................................................v, 12

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*,
    638 N.W.2d 409 (Mich. 2002) ...................................................................v, 14

*Chapman v. Tristar Products*,
    940 F.3d 299 (6th Cir. 2019)...................................................................*passim*

*Com. of Mass. v. Bull HN Info. Sys., Inc.*,
    16 F. Supp. 2d 90 (D. Mass. 1998)..................................................................8

*Dickson v. Direct Energy, LP*,
    69 F.4th 338 (6th Cir. 2023)..........................................................................10

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
    671 F. Supp. 3d 387 (S.D.N.Y. 2023) ...........................................................11

*In re Electronic Books Antitrust Litigation*,
    14 F. Supp. 3d 525 (S.D.N.Y. 2014) ...............................................................5

*Gladstone Realtors v. Vill. of Bellwood*,
    441 U.S. 91 (1979)...........................................................................................6

*Illinois v. SDS W. Corp.*,
    640 F. Supp. 2d 1047 (C.D. Ill. 2009) ...........................................................11

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022)....................................................................*passim*

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014).......................................................................v, 5, 6, 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................11

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007)............................................................................v, 5

*Michigan State Chiropractic Ass'n v. Kelley*,
    262 N.W.2d 676 (Mich. Ct. App. 1977).........................................v, 14

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).................................................................................10

*United States v. Providence J. Co.*,
    485 U.S. 693 (1988).................................................................................12

*In re Volpert*,
    175 B.R. 247 (Bankr. N.D. Ill. 1994) .................................................11

**Statutes**

18 U.S.C. § 2510(6) ............................................................................v, 15

18 U.S.C. § 2710(c)(1) ....................................................................v, 7, 15

18 U.S.C. § 2711(1) ...........................................................................v, 15

15 U.S.C. § 6502......................................................................................8

Mich. Comp. Laws § 14.28.............................................................v, 14

Mich. Comp. Laws § 445.901 *et seq.*...................................................8

Mich. Comp. Laws § 445.1711 ...............................................................7

**Other Authorities**

Wright & Miller, Federal Practice and Procedure § 8335–36 .................9

Wright & Miller, Federal Practice and Procedure § 8343 ......................6

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.    What is the relationship between the *parens patriae* and Article III

standing doctrines?

2.    Does the Attorney General have Article III standing for each cause of

action she asserts based upon Roku's invasions of her quasi-sovereign

and/or sovereign interests?

3.    Does the Attorney General have statutory authorization to sue for each of

the causes of action she asserts?

**CONTROLLING OR MOST APPROPRIATE AUTHORITIES**

**Issue 1 – Relationship Between *Parens Patriae* and Article III Standing**

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007)

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022)

*Chapman v. Tristar Products*, 940 F.3d 299 (6th Cir. 2019)

**Issue 2 – The Attorney General's Article III Standing**

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267 (2022)

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982)

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022)

**Issue 3 – The Attorney General's Statutory Authorization to Sue**

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*, 638 N.W.2d 409 (Mich. 2002)

*Michigan State Chiropractic Ass'n v. Kelley*, 262 N.W.2d 676 (Mich. Ct. App. 1977)

18 U.S.C. § 2710(c)(1)

18 U.S.C. § 2711(1)

18 U.S.C. § 2510(6)

Mich. Comp. Laws § 14.28

## <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

In her complaint filed April 29, 2025, Michigan Attorney General Dana Nessel alleges that Roku violates the Children's Online Privacy Protection Act (COPPA); that Roku facilitates the collection and sharing of the physical location data of children and other Roku users as they move about the world; that Roku actively misleads its customers about the data it collects and its users' power to limit that data collection; that Roku has been unjustly enriched by its illegal and deceptive collection of users' data; and that Roku discloses the video content its users watch to third parties in violation of federal and state video privacy laws. Dkt. 1 at 43–53.[1]

Roku has gone to great lengths to ensure that the public laws it violates cannot be broadly enforced by private parties. In 2024, Roku locked down users' televisions until they agreed to a broad class action waiver and arbitration clause that would prevent them from seeking relief in court. It required users who wished not to be bound to opt out via mailed letter within 30 days.[2] Roku later sued its own customers for tens of thousands of dollars when they initiated arbitrations without complying with Roku's procedural diktats. Dkt. 16 ("MTD Opp.") at 135 n.6. And in just the

---

[1] References to page numbers in ECF docket filings are to ECF PgIDs.

[2] Jordan Hart, *If you want to keep watching Roku TV, you'll have to agree to its new terms — or opt-out over mail*, Business Insider (Mar. 8, 2024), https://www.businessinsider.com/roku-tv-users-have-to-agree-not-to-sue-terms-2024-3 ("Once you've received the new dispute resolution terms, you have 30 days to mail a letter declining arbitration. Sending an email won't work. . . . Roku owners who agreed to the changes just to be able to keep using their TV can still mail in a letter opting out of arbitration — as long as it's sent in on time.").

last two months, Roku sought to compel arbitration of private class-action claims brought by children based upon the Attorney General's allegations in this case. *See A.A. v. Roku, Inc.*, No. 25-cv-06284-NW (N.D. Cal.), Dkt. 42; *E.A.R.R. v. Roku, Inc.*, 25-cv-02474-JGB-DTB (C.D. Cal.), Dkt. 27.

Roku's aggressive tactics against private litigants underscore the importance of suits by public enforcers such as the Attorney General. Following argument on Roku's motion to dismiss, this Court invited the parties to provide further briefing on certain issues related to litigation by government plaintiffs: (1) the relationship between the *parens patriae* and Article III standing doctrines; (2) the Attorney General's standing to bring each of her claims based upon her (a) quasi-sovereign interests and (b) her sovereign interest in enforcement of Michigan law; and (3) the Attorney General's statutory authorization to bring her claims. Dkt. 30 ("Order"). These issues are addressed in succession below.

## ARGUMENT

### I.  The Relationship Between *Parens Patriae* and Article III Standing

The *parens patriae* doctrine and jurisdictional standing under Article III are closely related. The *parens patriae* inquiry determines whether the Attorney General has a valid legally protected interest (in the form of a quasi-sovereign interest) such that, when invaded, it gives rise to Article III standing. In other words, when a state brings claims in its *parens patriae* capacity, it asserts an injury to its quasi-sovereign interests. The Article III standing analysis then examines whether that injury satisfies

2

Article III's requirements that the injury be concrete and particularized, actual or imminent, caused by the defendant, and redressable by the cause of action. The same analysis applies where a state has a sovereign interest, even though sovereign-interest claims may not technically fall under *parens patriae*.

This two-step process was on display in the Sixth Circuit's recent decision in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022). There, the Sixth Circuit explained that once a court has defined the state's interests, it plugs those interests directly into the Article III injury-in-fact analysis:

> We reserve the *constitutional* standing analysis—injury-in-fact, causation, and redressability—until we have defined the plaintiffs' relevant interests. Until we have defined those interests (that is, the sovereign, quasi-sovereign, and proprietary interests at stake), we cannot analyze whether those interests have suffered a redressable injury-in-fact caused by the defendants.

*Kentucky*, 23 F.4th at 594 & n.6.[3]

---

[3] While the *Kentucky v. Biden* court did not refer to claims based upon the states' quasi-sovereign interests as *parens patriae* claims, this was a product of the states' framing of the case. The Sixth Circuit acknowledged that other courts would call those claims asserting an injury to a quasi-sovereign interest *parens patriae* claims. The state plaintiffs in *Kentucky* purported to assert claims based upon their "sovereign, quasi-sovereign, proprietary, and *parens patriae* interests," thus causing the court to reject what the states called their *parens patriae* theory, which was really "an (impermissible) third-party *parens patriae* theory." 23 F.4th at 597. The Sixth Circuit nonetheless held that the states had standing to assert claims based upon injuries to valid quasi-sovereign interests, such as harms to the states' economies, and acknowledged that such theories are "sometimes nominally labeled '*parens patriae*' suits." *Id.* at 598. Consistent with *Chapman v. Tristar Products*, 940 F.3d 299 (6th Cir. 2019), and Supreme Court precedent, the Attorney General refers to claims asserting harms to quasi-sovereign interests as "*parens patriae*" claims.

3

The *Kentucky* case involved multiple states' challenges to a federal COVID-19 vaccine mandate, which the states claimed invaded their quasi-sovereign and sovereign interests in the "health and 'economic well-being' of their populaces," in "defending their economies from the alleged negative ramifications," and in preserving the "states' power to make and enforce policies and regulations." *Kentucky*, 23 F.4th at 599, 601. Applying the above two-step procedure, the Sixth Circuit first concluded that the states' asserted interests were among the "variety of sovereign and quasi-sovereign interests that [states] validly may seek to vindicate in litigation." *Id.* at 598. In the second step, the Sixth Circuit held the states had Article III standing because the COVID-19 vaccine mandate's alleged invasion of these valid sovereign and quasi-sovereign interests "satisf[ied] Article III's standing requirements," including for "imminent injury." *Id.* at 601–02.

This approach is consistent with the Sixth Circuit's prior decision in *Chapman v. Tristar Products*, 940 F.3d 299 (6th Cir. 2019). In *Chapman*, the Sixth Circuit reasoned under the "first principles" of "Article III . . . standing" that an invasion of the state's quasi-sovereign interests provided one of the "theories of injury." 940 F.3d at 303–04. The *Chapman* court then held that Arizona's failure to articulate a valid quasi-sovereign interest for purposes of *parens patriae* standing meant that the court was "barred by Article III" from deciding the case. *Id.* at 307.

4

The Sixth Circuit's approach in *Kentucky* and *Chapman* follows that of the Supreme Court in *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007). There, the Supreme Court first concluded that Massachusetts had a quasi-sovereign interest in preventing harms from sea-level rise, and then held that Massachusetts identified a redressable injury in fact to that quasi-sovereign interest sufficient to confer Article III standing. *Massachusetts*, 549 U.S. at 520–26. In *Kentucky*, the Sixth Circuit emphasized the continued vitality of the rule "recognized in *Massachusetts v. E.P.A.*"—namely, "that a state has standing . . . to vindicate its '*quasi-sovereign*' interests." 23 F.4th at 598 (internal quotation marks omitted).

Nothing in the above is contrary to the holding in *In re Electronic Books Antitrust Litigation* ("*E-Books*"), 14 F. Supp. 3d 525 (S.D.N.Y. 2014), cited in the Court's Order (at 316), but the Attorney General respectfully recommends against relying on the dicta in that decision. Citing the dissent in *Massachusetts v. E.P.A.* and certain statements in *Lexmark International v. Static Control Components*, 572 U.S. 118 (2014), *E-Books* characterizes *parens patriae* as a "prudential standing" inquiry—and one apparently separate from Article III analysis. *E-Books*, 14 F. Supp. 3d at 534. *E-Books* relies on a portion of *Lexmark* discussing the Supreme Court's past articulation of a "'prudential' branch of standing." *Id.* (quoting *Lexmark*, 572 U.S. at 126). But *Lexmark's* description of prudential standing jurisprudence was not an endorsement. *Lexmark* went on to call prudential standing a "misleading"

5

concept in "tension with [the Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."[4] 572 U.S. at 125–27 & n.3–4 (internal quotation marks omitted). This criticism "signaled a possible intention to do away with the category of 'prudential' standing altogether." Wright & Miller, Federal Prac. and Proc. § 8343.

The Attorney General respectfully submits that calling the *parens patriae* inquiry a form of "prudential standing" analysis may be more confusing than clarifying.[5] The *parens patriae* doctrine is part and parcel with the Article III inquiry. In the words of Roku's counsel at oral argument, the *parens patriae* doctrine "furnishes a pathway towards Article III standing" such that the "State articulate[s] a quasi-sovereign interest," and the Court then considers whether the injury to that interest is "concrete enough to create a case in controversy." Dkt. 28 at 271–72.

## II. The Attorney General Has Article III Standing

The test for Article III standing "has coalesced around three elements": (1) that the plaintiff suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

---

[4] *Lexmark* acknowledged that older cases, in line with *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979), "previously classified" standing inquiries as "prudential" but "found that label inapt" because those cases in fact turned on the constitutional question whether the plaintiff suffered an injury. 572 U.S. at 127 n.3.
[5] Admittedly, while the *Kentucky* court never used the term "prudential standing," it did refer to its inquiry defining the interests of the states as a "prudential" one. 23 F.4th at 601. Ultimately, the nomenclature is of little importance so long as the Court approaches the standing question through the two-step process outlined here.

6

hypothetical"; (2) that there is "a causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Kentucky*, 23 F.4th at 601 (citation modified). Thus, once a court has "defined [the state's] interests (that is, the sovereign, quasi-sovereign, and proprietary interests at stake)," *id.* at 594 n.6, it determines whether any alleged invasion of one of those interests is concrete and particularized, and actual or imminent, and confirms that the invasion was allegedly caused by the defendant and is redressable by the cause of action, *id.* at 601.

## A. Standing Based Upon Quasi-Sovereign Interests

Plaintiff refers the Court to her opposition to Roku's motion to dismiss for a discussion of the State's quasi-sovereign interests supporting *parens patriae* standing with respect to claims under the federal Video Privacy Protection Act, 18 U.S.C. § 2710 (Cause of Action 3); the Michigan Preservation of Personal Privacy Act (PPPA), Mich. Comp. Laws § 445.1711 (Cause of Action 4); common law intrusion upon seclusion (Cause of Action 6); and common law unjust enrichment (Cause of Action 7). MTD Opp. at 129–33. The Attorney General explained that these causes of action asserted injuries to at least three distinct quasi-sovereign interests that have been widely recognized as valid by courts in this Circuit and across the country: (1) "ensuring fair business conduct in the State," (2) "preventing widespread privacy violations within Michigan," and (3) preventing harm to the

privacy of "children in particular." *Id.* at 130–31. Though not contested by Roku, these same quasi-sovereign interests support Michigan's claims under COPPA, 15 U.S.C. § 6502 (Causes of Action 1 and 2), and the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws § 445.901 *et seq.* (Cause of Action 5).

The validity of the State's quasi-sovereign interests is confirmed by Michigan's use of its law-making powers to address privacy abuses such as Roku's—first by enacting the PPPA, and then by seeking to pass robust legislation to protect residents' privacy from conduct like Roku's. *See* MTD Opp. at 132 & n.3–4. As *Chapman* explained, this is "the best indication" that "a sufficiently high proportion of the citizenry of a state face harm to their . . . well-being to justify standing under *parens patriae*."[6] 940 F.3d at 305. The fact that Roku's customers will have difficulty redressing these harms with private litigation also supports the validity of the quasi-sovereign interests here. *See, e.g.*, *Com. of Mass. v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 102 (D. Mass. 1998) (finding *parens patriae* showing satisfied where Massachusetts "alleged conduct that has potentially wide-

---

[6] Roku's contention at oral argument (at 305) that the State has not passed the proposed privacy legislation misunderstands the relevant law (in addition to overlooking the PPPA). Neither *Chapman* nor the *Snapp* decision on which it relied requires the State to have *actually enacted* a law dealing with the claimed injury. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (holding that Puerto Rico had quasi-sovereign interests because they implicated an issue that Puerto Rico "*may address* . . . through its own legislation" (emphasis added)); *Chapman*, 940 F.3d at 305 ("the best indication is whether the State would, if it could, address the issue 'through its sovereign law-making powers'").

spread impacts . . . that are unlikely to be addressed fully if the controversy is cabined in the realm of private litigation" due to waivers of rights that "strongly militate against private suits").

Turning to the Article III inquiry, the alleged conduct underlying the Attorney General's video privacy claims (Causes of Action 3 and 4)—the widespread sharing of Michigan residents' private video viewing in violation of state and federal law—straightforwardly invades the State's quasi-sovereign interests in ensuring fair business conduct, preventing widespread privacy violations, and preventing harm to children. The same is true for the conduct underlying the Attorney General's intrusion upon seclusion and unjust enrichment claims (Causes of Action 6 and 7), where Roku invades the same quasi-sovereign interests by facilitating the tracking of users' physical movements and by illegally profiting from users' personal data.

For each cause of action, the invasion of the Attorney General's quasi-sovereign interests is actual (the invasions happened) and imminent (they are ongoing), as well as concrete (they are "real" harms traditionally recognized) and particularized (the State uniquely has these quasi-sovereign interests, "distinct from the injuries others have suffered"). Wright & Miller, Fed. Prac. and Proc. § 8335–36; *see also Kentucky*, 23 F.4th at 599.

Contrary to Roku's claims at oral argument (at 271–72), there is little doubt that the injuries here—Roku's invasions of Michigan's quasi-sovereign and

sovereign interests—are concrete.[7] As the Supreme Court has explained, "[v]arious intangible harms can also be concrete," even though they are not physical in nature. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The test is whether the harm is "real, and not abstract," focusing on whether it "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 424–25 (citation modified). Traditional harms undoubtedly include "disclosure of private information, and intrusion upon seclusion." *Id.* at 425; *Dickson v. Direct Energy, LP*, 69 F.4th 338, 348 (6th Cir. 2023) (unwanted ringless voicemail held concrete as "an intangible harm that bears a sufficiently close relationship to the traditional common law tort of intrusion upon seclusion"). The harms to Michigan's quasi-sovereign interests in preventing such widespread privacy violations, as well as ensuring fair business conduct in the state and protecting the interests of children, are all "traditionally recognized." *See, e.g.*, *Snapp*, 458 U.S. at 607–09 (surveying history of quasi-sovereign harms, including harm to a state's "economic and

---

[7] At oral argument, Roku contended a quasi-sovereign interest asserted by the Attorney General "has to be concrete." Dkt. 28 at 271–72 ("Now, quasi-sovereign interest is something, because it's rooted in standing, that has to be concrete."). Two sentences later, Roku argued that, to have standing, the Attorney General must allege a "concrete injury" to that quasi-sovereign interest. *Id.* at 272. The former point is mistaken. The test articulated in *Chapman* controls the validity of the quasi-sovereign interest. Roku's latter point, that the *invasion* of the State's valid quasi-sovereign interest must be concrete, is of course correct, as this Court understood. *Id.* at 293 (asking how "concrete of an injury" is required).

commercial interests"); *Kentucky*, 23 F.4th at 599 (recognizing harm to "states' traditional prerogative to superintend their citizens' health and safety").[8]

The second and third prongs of the Article III standing inquiry are even more straightforward. There is a "causal connection" between Roku's conduct and the violations of the quasi-sovereign interests for each cause of action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And the injunctive relief, damages, and other equitable relief sought by the Attorney General will redress the injuries to the quasi-sovereign interests. *Id.* at 561.

The above analysis applies with equal force to the Attorney General's standing to bring claims under COPPA and the MCPA, which Roku does not challenge. The Court could thus conclude it has jurisdiction with respect to all causes of action based upon Roku's invasion of the three quasi-sovereign interests articulated above.

## B. Standing Based Upon Sovereign Interest

The Court directed the parties (at 317–19) to address the Attorney General's standing based upon harms to Michigan's sovereign interest in enforcing state law.

---

[8] *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 403 (S.D.N.Y. 2023) (injury to "general" quasi-sovereign "interest in 'assuring its residents it will act to protect them from the harmful effects of criminal sex-trafficking'"); *Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1051 (C.D. Ill. 2009) (injury to quasi-sovereign interest in "securing an honest marketplace"); *In re Volpert*, 175 B.R. 247, 257 (Bankr. N.D. Ill. 1994) (injury to quasi-sovereign "interest in protecting individual securities investors from economic harm").

The Attorney General asserts claims for violations of Michigan statutory and common law in Causes of Action 4–7. Even if the Court were to reject the Attorney General's asserted quasi-sovereign interests with respect to these claims, the Attorney General would still have standing to bring Causes of Action 4–7 based upon the invasion of Michigan's sovereign interest in enforcing its law.

The Sixth Circuit held in *Kentucky v. Biden* that states have a sovereign interest in the enforcement of state law. 23 F.4th at 599. This holding reflects longstanding Supreme Court precedent defining sovereign interests. *See Snapp*, 458 U.S. at 601 ("sovereign interest [is] easily identified" in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—*this involves the power to create and enforce a legal code*" (emphasis added)); *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) ("Paramount among the States' retained sovereign powers is the power to enact and enforce any laws that do not conflict with federal law."). This sovereign interest in enforcing Michigan law extends to all claims under state law, regardless of statutory or common-law form. *See United States v. Providence J. Co.*, 485 U.S. 693, 700 (1988) ("the violation of a court order instead of common law or a statutory prohibition does not render the prosecution any less an exercise of the sovereign power").

Roku's violations of state law are actual and imminent (they have happened and are ongoing), concrete and particularized (they are not abstract and harm the

State in a unique way), are caused by Roku, and would be redressed by favorable rulings on the causes of action. The Attorney General has standing to bring her state law causes of action based upon Roku's invasions of the State's sovereign interest.

### III. Statutory Authority to Bring Suit

Finally, this Court's Order directed the parties to address whether Michigan has the statutory authority to bring suit under its various claims. Order at 317–18. While the Order called this a question of "prudential standing," *id.*, *Lexmark* resisted that label, instead viewing the question whether a plaintiff "falls within the class of plaintiffs . . . authorized to sue" as one calling for the "traditional tools of statutory interpretation" rather than vaguer counsels of prudence. 572 U.S. at 127–28.

Because this inquiry is non-jurisdictional under *Lexmark*, Roku waived it. *Id.* at 128 n.4 (lack of statutory authority "does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case"). But regardless, the Attorney General has statutory authority to bring all her claims.

***COPPA & MCPA***. As the Order recognized, the Attorney General has explicit and specific authority to pursue the claims under COPPA and the MCPA, and Roku never challenged those grants.

***PPPA, Intrusion Upon Seclusion, and Unjust Enrichment.*** For the remaining state-law claims, the relevant statute provides that the Attorney General "may, when in in [her] own judgment the interests of the state require it . . . appear

for the people of this state . . . in any cause or matter." Mich. Comp. Laws § 14.28. Michigan courts have interpreted this statute to provide the Attorney General with broad "statutory and common law authority to act on behalf of the people of the State of Michigan in any cause or matter," holding that "[s]uch liberally construed authority and discretion should only be interfered with where [the Attorney General's] actions are clearly inimical to the people's interest." *Michigan State Chiropractic Ass'n v. Kelley*, 262 N.W.2d 676, 677 (Mich. Ct. App. 1977). The Michigan Supreme Court reaffirmed this power in *In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*, holding that the Attorney General "has broad authority to bring actions that are in the interest of the state of Michigan," to "litigate on behalf of the people of the state," and to "*initiate* actions" where "'there is no express legislative restriction to the contrary.'" 638 N.W.2d 409, 413 (Mich. 2002) (quoting *In re Lewis' Estate*, 283 N.W. 21, 23 (Mich. 1938)). That decision recognized that the Attorney General could bring claims not just under the MCPA, but also for unjust enrichment and breach of duty. *Id.* at 411.

*In re Certified Question* also held that the Michigan Attorney General had the authority to bring and settle claims for damages. *Id.* The Attorney General thus has broad statutory authority to bring claims for violations of state statutory and common law, and seek damages for those violations, even where individual statutes do not

14

expressly authorize the Attorney General to sue. The Attorney General has statutory authorization to bring her PPPA and common law claims.

*VPPA.* While less elegant than COPPA's statutory grant, the Video Privacy Protection Act also explicitly authorizes the Attorney General's suit. The VPPA authorizes "[a]ny person aggrieved by any act of a person in violation" of the statute to bring suit. 18 U.S.C. § 2710(c)(1). "Person" is a defined term under the statute that explicitly includes states: section 2711 provides that "terms defined in section 2510 of this title [Title 18] have, respectively, the [same] definitions" in the VPPA, 18 U.S.C. § 2711(1), and section 2510 provides that "'person' means any employee, or agent of the United States or any State." 18 U.S.C. § 2510(6). Michigan has been aggrieved by Roku's violations because they invade its quasi-sovereign interests in ensuring fair business conduct in the state, preventing widespread privacy violations, and protecting the interests of children. The Attorney General thus has express statutory authorization to sue under the VPPA.

## CONCLUSION

For the reasons set forth above, and in the Attorney General's prior briefing, this Court should hold that the Attorney General has Article III standing to assert each of her causes of action and deny Roku's motion to dismiss in its entirety.

Dated: January 16, 2026                    Respectfully submitted,

                                           By: */s/ David Walchak*
                                           David Walchak (IL Bar No. 6341004)

15

Jason Evans (P61567)
Division Chief, Corporate Oversight
Division
Michigan Department of Attorney General
EvansJ@michigan.gov
PO Box 30736
Lansing, MI 48909
Tel: (517) 335-7622

Darrin Fowler (P53464)
First Assistant, Corporate Oversight
Division
Michigan Department of Attorney General
fowlerd1@michigan.gov

Daniel Ping (P81482)
Assistant Attorney General, Corporate
Oversight Division
Michigan Department of Attorney General
pingd@michigan.gov

LeAnn Scott (P84053)
Assistant Attorney General, Corporate
Oversight Division
Michigan Department of Attorney General
scottl21@michigan.gov

George A. Zelcs (IL Bar No. 3123738)
David Walchak (IL Bar No. 6341004)
Ryan Z. Cortazar (IL Bar No. 6323766)
Pamela I. Yaacoub (IL Bar No. 6327801)
Korein Tillery LLC
205 N Michigan Ave., Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750 / Fax: (312) 641-9751
gzelcs@koreintillery.com
dwalchak@koreintillery.com
rcortazar@koreintillery.com
pyaacoub@koreintillery.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 16, 2026, I electronically filed the foregoing paper with the Clerk of this Court using the ECF System, which will provide notice of such filing to all parties and counsel of record.

*/s/ David Walchak*
David Walchak
