UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ATTORNEY GENERAL DANA
NESSEL,

Case No. 2:25-cv-11221

Plaintiff,

HONORABLE STEPHEN J. MURPHY, III

v.

ROKU, INC,

Defendant.

_____/

**ORDER GRANTING
DEFENDANT'S PARTIAL MOTION TO DISMISS [11]**

The Michigan Attorney General Dana Nessel, on behalf of the People of the

State of Michigan, sued Defendant Roku, Inc. "to put a stop to Roku's illegal data

collection and disclosure practices." ECF No. 1, PageID.3. She asserted seven claims

against Roku related to its data collection and dissemination practices. *Id.* Roku

moved to dismiss claims three through seven. ECF No. 11. In the interim, the Court

allowed limited discovery on the first two claims under the Children's Online Privacy

Protection Act. ECF No. 19. The Court held a hearing on Defendant's motion to

dismiss on November 19, 2025. Following the hearing, the Court requested

supplemental briefing from the parties on standing issues. ECF No. 30. Having

considered the parties' original and supplemental briefing, the Court will grant

Roku's partial motion to dismiss.

1

## BACKGROUND

Roku is a television and streaming platform that permits users to access Roku's own streaming application, third party applications, and live television. ECF No. 1, PageID.4. Roku is a dominant smart TV operating system in the United States. *Id.* The Attorney General brought the instant action against Roku because the company allegedly "designed its platform to ensure that it collects children's data and that third parties can do the same." *Id.* Roku, unlike its competitors, does not allow parents to create children's profiles. *Id.* at PageID.2. Because of "lax data privacy standards," according to the complaint, Roku illegally uses the data it collects and permits third parties to use its platform to collect and monetize the personal information of children. And Roku's illegal conduct allegedly extends beyond child users: the company actively misleads customers about the collection of personal information, sows confusion about parents' rights, and discloses to third parties the video content its users watch along with those users' personally identifiable information. *Id.* at PageID.3.

The Attorney General brought seven claims (three federal, four state) against Roku. In counts one and two, Plaintiff alleged that Roku violated the Children's Online Privacy Protection Act ("COPPA") by collecting children's personal information as an operator of an online service directed to children with actual knowledge that it was collecting such personal information. ECF No. 1, PageID.43–

2

47. Defendant did not move to dismiss Plaintiff's COPPA claims, despite asserting that the claims "have no merit."[1] ECF No. 11, PageID.91.

In counts three and four, the Attorney General alleged that Roku violated the Video Privacy Protection Act ("VPPA") and the Michigan Preservation of Personal Privacy Act ("PPPA"). ECF No. 1, PageID.47–49. Roku moved to dismiss those claims for failure to state a claim because, it argued, they are conclusory, fail to allege disclosure of personally indefinable information, and fail to plead disclosure of personal watch history. ECF No. 11, PageID.98–105.

In count five, the Attorney General alleged that Roku violated the Michigan Consumer Protection Act ("MCPA"). ECF No. 1, PageID.49–50. Roku moved to dismiss for failure to state a claim because the complaint failed to plead specific misrepresentations with the particularity the statute requires. ECF No. 11, PageID.105–109.

In count six, the Attorney General alleged that Roku intruded upon the seclusion of Michigan residents. ECF No. 1, PageID.50–53. Defendant moved to dismiss for failure to state a claim because an intrusion claim and VPPA, PPPA or MCPA violations are different harms, and thus, according to Roku, the intrusion claim cannot be premised on the statutory violations. ECF No. 11, PageID.109–112, Roku also argued there was no allegation that Roku knew about a third party's secret

---

[1] In supplemental briefing, Roku argued that the Attorney General also lacked Article III standing to bring the COPPA claims, *see* ECF No. 31, PageID.328–333, but it never moved to dismiss them.

collection of geolocation data and, therefore, that it cannot be secondarily liable for intrusion. *Id.*

In count seven, the Attorney General alleged that Roku was "unjustly enriched by its collection, sale, and sharing of the personal information of Michigan residents who instructed Roku to limit ad tracking and to not share or sell their personal information." ECF No. 1, PageID.52–53. Defendant moved to dismiss the claim because the claim is arguably "largely derivative" of its other failed claims and because there is no tie between Roku users' provision of their personal information and Roku's beneficial use of it. ECF No. 11, PageID.112.

Finally, Roku argued that the Attorney General lacked *parens patriae* standing to bring certain claims on behalf of Michigan residents. Defendant moved to dismiss counts three (VPPA), four (PPPA), six (Intrusion) and seven (Unjust Enrichment) because Plaintiff is "attempt[ing] to usurp the damages claims of Michigan Residents." ECF No. 11, PageID.94–98. In supplemental briefing, Roku argued that the Attorney General did not have standing to bring count five (MCPA) either. ECF No. 31, PageID.335 n.4. Roku did not move to dismiss the COPPA claim for lack of parens patriae standing because state attorneys general can sue to enforce COPPA on behalf of residents. *See* 15 U.S.C. § 6504(a)(1). But in supplemental briefing, Roku argued that the COPPA claims should be dismissed as well for lack of jurisdictional standing, despite never having moved to dismiss them.

4

## LEGAL STANDARD

"A motion under Rule 12(b)(1) to dismiss a complaint for lack of subject matter jurisdiction must be considered prior to other challenges since proper jurisdiction is a prerequisite to determining the validity of a claim." *Bowles v. Sabree*, No. 20-12838, 2022 WL 141666, at *3 (E.D. Mich. Jan. 14, 2022). Plaintiff has the burden of proving that jurisdiction exists. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "If the [C]ourt determines at any time that it lacks subject-matter jurisdiction, the [C]ourt must dismiss the action." Fed. R. Civ. P. 12(h)(3).

A district court may also grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Court views the complaint in the light most favorable to the plaintiff, presumes the truth of all well-pleaded factual assertions, and draws every reasonable inference in the nonmoving party's favor. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court will not presume the truth of legal conclusions in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true," then the Court must dismiss it. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

In a Rule 12(b)(6) motion, courts can only "consider the [c]omplaint and any exhibits attached thereto . . . [and] items appearing in the record of the case and

exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430 (citation omitted); *see also Decoration Design Sols., Inc. v. Amcor Rigid Plastics USA, Inc.*, 553 F. Supp. 3d 424, 427 (E.D. Mich. 2021) (Murphy, J.).

## DISCUSSION

The Court begins and ends with standing. Because the Court finds that standing is lacking for claims three through seven, it must dismiss those claims, and it need not address Roku's alternate arguments for dismissal.

I.      Standing as a State

State suits in federal court raise unique standing issues. Often, those suits are lodged by individual states against the federal government. Here, however, Dana Nessel, the Attorney General of the state of Michigan sued a private entity "ex rel. The People of the State of Michigan." ECF No. 1, PageID.1. To demonstrate standing in federal court for such a case, she must point to a quasi-sovereign interest, a sovereign interest, or a proprietary interest the state has in the subject matter. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982). Proprietary interests are not at issue here, so the Court will consider only whether the first two kinds of interests apply.

a. *Quasi-Sovereign Interest*

The Court will address as an initial matter whether Plaintiff has a quasi-sovereign interest in the subject matter at issue. To resolve the question, the Court must explain the interrelated concept of parens patriae standing.

6

*Parens patriae*, "parent of the country," standing is an outgrowth of the common law "royal prerogative" concept, to take care of persons who were legally unable to care for themselves and their property. *Id.* at 600. But the modern doctrine is much narrower. *Id.* Today, a state may not step in to represent its citizens without a real interest of its own. *Id.* Instead, to establish parens patriae standing in a federal lawsuit, a state must assert its specific "quasi-sovereign interest"—an interest in bringing the litigation that is separate from the interests of the particular private parties that may be involved. *Id.* at 607. Though the Supreme Court has defined a quasi-sovereign interest as a "set of interests that the State has in the well-being of its populace," it has also warned that such a definition "risks being too vague to survive the standing requirements of Art. III." *Snapp*, 458 U.S. at 602. Because a "quasi-sovereign" interest does not lend itself to a simple definition, it is decided "on case-by-case" basis. *Id.* at 607; *see also Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). It is clear, however, that the State cannot be a "nominal party" that merely asserts claims that private individuals could make themselves. *Chapman*, 940 F.3d at 305.

There are generally two recognized categories of quasi-sovereign interests a state can assert: (1) "the health and well-being—both physical and economic—of its residents in general," and (2) "not being discriminatorily denied its rightful status within the federal system." *Snapp*, 458 U.S. at 607. But even then, any interest in the health and well-being of residents is not enough to confer standing unless the alleged harm is widespread. "In determining whether a sufficiently high proportion

7

of the citizenry of a state face harm to their health and well-being to justify standing under *parens patriae*, the best indication is whether the State would, if it could, address the issue 'through its sovereign law-making powers.'" *Chapman*, 940 F.3d at 305 (quoting *Snapp*, 458 U.S. at 607); *see also* 17 *Wright & Miller's Federal Practice & Procedure* § 4047 (3d. ed. 2025) (explaining that "the plaintiff state must be pursuing . . . a broad public interest that involves at least a large number of its citizens"). While there may be some overlap between the state's and individuals' injuries, the state must claim an injury that "is really an additional injury to the state itself." *Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022).

In sum, to have standing to sue, the state plaintiff must establish that it is asserting a quasi-sovereign interest that has been injured, and that the challenged conduct affects a "sufficiently substantial segment of its population." *Snapp*, 458 U.S. at 607. The impact of the challenged conduct on a State's population may be measured by considering both the direct and indirect injuries it causes. *Id.*; *Maryland v. Louisiana*, 451 U.S. 725, 736 (1981) (holding that the State had parens patriae standing to sue on behalf of consumers even when the challenged tax was not imposed "directly on the ultimate consumers").

Due consideration of the caselaw raises a question: is parens patriae a prudential doctrine or a jurisdictional requirement? Normally, the Court might gloss over the difference. Here, however, the answer is important because the claims involve a congressional conferral of parens patriae standing, as well as some claims that can be brought only by the state and others that could be brought by individual

citizens. If the doctrine were jurisdictional, Congress could not confer parens patriae standing by statute. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Thus, the Court will take a brief detour to explain why parens patriae is best understood as a prudential doctrine about who can sue before explaining how it applies here.

### i. Parens patriae as a prudential doctrine

The parties disagree on whether parens patriae is a prudential doctrine. Roku argued that it is, so the Attorney General must demonstrate "both injury in fact to the State's citizens and to the State's quasi-sovereign interest apart from the interests of particular private parties." ECF No. 31, PageID.328 (citation modified). Roku reasoned that, while the jurisdictional test for parens patriae standing "focuses on the concreteness of this interest, prudential standing considers the *Snapp* factors assessing the magnitude of the interest." *Id.* at PageID.335. Unsurprisingly, Roku concluded that the Attorney General lacked a quasi-sovereign interest to get past the prudential parens patriae standing bar. The Attorney General disagreed. She argued that the parens patriae doctrine and jurisdictional standing doctrines "are closely related . . . such that, when invaded, [a quasi-sovereign interest] gives rise to Article III standing." ECF No. 32, PageID.350. To evaluate the disagreement, the Court will turn to the handful of binding authorities on the issue.

The seminal case on parens patriae standing is *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982). There, Puerto Rico sued east coast apple growers who allegedly (1) discriminated against Puerto Rican workers in favor of foreign temporary laborers and (2) denied Puerto Ricans the benefits of domestic

9

work opportunities guaranteed by federal law. *Id.* at 608. The Court held that Puerto Rico had an independent interest in combatting discrimination against Puerto Ricans and assuring that the benefits of the federal system were not denied to its general population. *Id.* at 609–10. But the Court emphasized "[o]nce again, we caution that the State must be more than a nominal party." *Id.* at 608. The Supreme Court did not further explain or elaborate on the quasi-sovereign interest. Rather, it noted that "a 'quasi-sovereign' interest . . . is a judicial construct that does not lend itself to a simple or exact definition . . . . The vagueness of this concept can only be filled in by turning to individual cases." *Id.* at 601–02.

Second, in *Massachusetts v. E.P.A*, 549 U.S. 497 (2007), the Supreme Court considered whether the Clean Air Act gave the EPA the statutory authority to regulate greenhouse gas emissions from new motor vehicles. A threshold issue in the case was whether "at least one petitioner ha[d] standing . . . under Article III of the Constitution." *Id.* at 505. The Supreme Court found that Massachusetts had standing to challenge the EPA's denial of its rulemaking petition. In doing so, the Court reasoned: "[j]ust as Georgia's independent interest 'in all the earth and air within its domain' supported federal jurisdiction a century ago [in *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)], so too does Massachusetts' well-founded desire to preserve its sovereign territory today." *Massachusetts*, 549 U.S. at 519. The Court identified the state's "stake in protecting its quasi-sovereign interests" and noted that states

10

get "special solicitude" in the standing analysis. *Id.* at 520.[2] The Court seemed to hold that when states are involved, courts put a thumb on the scale in favor of standing. But when it analyzed injury, the Court rested much of its analysis on the fact that that Massachusetts owned much of the state's coastline and therefore it had "a particularized injury in its capacity as a landowner." *Id.* at 522.

Third, in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), Kentucky, Ohio, Tennessee and two Ohio sheriffs' offices challenged vaccination requirements for federal contractors and subcontractors. The Sixth Circuit denied the Government's request to stay a preliminary injunction enjoining the federal government's contractor vaccination mandate pending appeal. First, the Sixth Circuit held that "[b]oth the plaintiff states and sheriffs' offices likely have standing to sue in their own proprietary capacities as contractors with the federal government.*" Id.* at 594. In discussing standing based on proprietary capacities, the Court noted "whatever the complexities of *parens patriae* standing, no one claims that a *prudential bar* blocks the states from litigating in their own proprietary capacities." *Id.* at 594 (emphasis added).

The Sixth Circuit determined that the states did not have standing as pure third parties, but they likely did have standing to bring claims based on their "sovereign and quasi-sovereign capacities." *Id.* at 599. As to the sovereign interest,

---

[2] The concept of states enjoying "special solicitude" has been subject to much criticism and has not "played a meaningful role in [the Supreme Court's] decisions in the years since [*Massachusetts v. EPA*]." *United States v. Texas*, 599 U.S. 670, 688–89 (2023) (Gorsuch, J. concurring); *see also id.* at 724 (Alito, J. dissenting) (questioning whether *Massachusetts v. EPA* has "been quietly interred").

11

the federal vaccination policy implicated the states' power to "make and enforce policies and regulations" and their "traditional prerogative to superintend their citizens' health and safety." *Id.* As to the states' quasi-sovereign interest, the mandate "threaten[ed] to damage each of the states' economies" because the states plausibly alleged "that resistance to the contractor mandate will result in layoffs, further supply-chain issues, and rising prices." *Id.* at 601.

After concluding that the plaintiffs had standing based on proprietary interests, sovereign interests, and quasi-sovereign interests, the Sixth Circuit moved on to "Constitutional Standing Under Article III." *Id.* at 601. It noted "[t]hus far we have concluded that likely no *prudential bar* prevents the states from suing the United States to vindicate their proprietary, sovereign, and quasi-sovereign interests." *Id.* (emphasis added). And it found that constitutional/jurisdictional standing was satisfied, even for the quasi-sovereign theory of liability. In short, there was a likelihood of an imminent injury because a "substantial portion [of citizens employed by federal contractors] will likely resist the contractor mandate [and] that resistance could lead to the loss of federal contracts or difficulty performing such contracts." *Id.* at 601–02. The Court therefore concluded that there was likely constitutional standing and that Plaintiffs had cleared the "prudential bar." *Id.* at 601–02.

Finally, in *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299 (6th Cir. 2019), the Sixth Circuit held that the Arizona Attorney General did not have standing to intervene in a class action to try and undo a settlement. The Court there considered

three theories of standing: parens patriae, the Class Action Fairness Act, and the state's interests as a "repeat player." *Id.* at 304. The Court emphasized that the State must articulate a quasi-sovereign interest separate and apart from that of particular parties. *Id.* at 305. Because there was only an injury to "an identifiable group of individual residents," the State did not have "standing under parens patriae." *Id.* at 306 (quoting *Snapp*, 458 U.S. at 607).

In its final paragraph, the Court in *Chapman* concluded that it was "barred by Article III" from moving onto the merits. *Id.* at 307. Although the Sixth Circuit may have viewed the general standing inquiry under the "first principles" of Article III, it did not mention Article III in its parens patriae analysis section. And it noted that the class members did have an injury. *See id.* at 305–06. The Court thus followed the same general process in as *Kentucky v. Biden*. First, a court should determine whether a quasi-sovereign interest exists. If it does not, the inquiry is over as to parens patriae. *See id.* If there is a sufficient quasi-sovereign injury, the Court then determines whether there is Article III standing as well. *See Biden*, 23 F.4th 601–02.

None of the four decisions analyzed above directly resolve the question here. In this suit, a state is bringing a variety of federal *and* state law claims. Two of the federal claims contain explicit authorization from Congress that only the state attorney general, as parens patriae, may bring the claims. *See, e.g.*, 15 U.S.C.S. § 6504. The MCPA claim empowers the Michigan Attorney General to file suit. Mich. Comp. Laws § 445.905. But the rest of the claims can be brought by individuals. Thus, the case involves interaction between federal and state claims, some authorized by

13

Congress, and some authorized by the state legislature. And crucially, some claims, if the Attorney General was permitted to bring them, would most likely preclude individual residents from bringing their own tort claims against Roku.

Except for the dissent in *Massachusetts v. EPA*, none of the cases analyzed above squarely discuss a jurisdictional versus prudential distinction. *See Massachusetts*, 549 U.S. at 540 n.1 (Roberts, C.J., dissenting) ("The point is that nothing in our cases (or Hart & Wechsler) suggests that the prudential requirements for *parens patriae* standing can somehow substitute for, or alter the content of, the irreducible constitutional minimum requirements of injury in fact, causation, and redressability under Article III.") (citation modified). Both *Massachusetts* and *Biden* involved a state adverse to the federal government. Those matters did not involve, as here, a state bringing claims that its citizens could themselves bring and the attendant worries that the state is usurping damages claims that belong to its residents.

Much of the confusion in this area of the law is because, after *Snapp*, the Supreme Court clarified the modern-day standing doctrine in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, (1992). The Court further refined it since then in cases like *Spokeo*, 578 U.S. 330 (2016) and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), but never provided guidance on whether parens patriae is part of the Article III inquiry or a threshold, prudential bar.[3]

---

[3] At bottom, the Court sees the parens patriae doctrine as one that is in tension with current federal standing doctrine. On the one hand, parens patriae is not purely a third-party doctrine and it is not clearly within the jurisdictional analysis. On the

Unsurprisingly, since *Snapp*, case-by-case analyses have created confusion and inconsistent approaches in the lower courts. *See New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 285 (2d Cir. 2024) (Cabranes, J. concurring) (discussing the case-by-case approach to quasi-sovereign interest as an "I-know-it-when-I-see-it" doctrine that "is an invitation to confusion" and explaining that "it should be no surprise that it has indeed sown some confusion among the Courts of Appeals").

While some courts analyze the parens patriae doctrine as part of the Article III inquiry, many agree that it is merely an additional prudential bar like the Chief Justice suggested in *Massachusetts v. EPA*. 549 U.S. at 540 n.1 (Roberts, C.J., dissenting); *see, e.g., People's Counsel v. FERC*, 760 F.2d 318, 320–22 (D.C. Cir. 1985) (Scalia, J.) (defining parens patriae as a component of prudential standing rather than constitutional standing); *Service Emps. Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 249 F.3d 1068, 1073 (D.C. Cir. 2001) (noting that "the doctrine of *parens patriae* is merely a species of prudential standing"); *Republic of Venezuela v. Philip Morris, Inc.*, 287 F.3d 192, 199 n.* (D.C. Cir. 2002) ("[T]he doctrine of parens patriae is merely a species of prudential standing.") (citation omitted); *Terr. of Am. Sam. v. Nat'l Marine Fisheries Serv.*, 822 F. App'x 650, 651 (9th Cir. 2020) ("Because

---

other hand, because the State must assert a "separate" injury, perhaps that "injury" should be considered within the Article III injury analysis. In the Court's opinion, the most concerning aspect of the Attorney General's theory here is that it would allow states to take citizens' claims who may not have an Article III injury at all and bring them "on behalf of the citizens of the state" to get past a jurisdictional bar. Because of that concern, the history, case law, and logic of the doctrine, the Court will not permit the Attorney General, as parens patriae, to assert those claims here.

parens patriae is a prudential doctrine and not a jurisdictional limitation, we need not reach this issue, and instead proceed to the merits."); *In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 534 (S.D.N.Y. 2014) ("It is well-established that the limitations on *parens patriae* standing set forth in cases like *Snapp* are prudential in nature."); *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1031 (M.D. Fla. 2021) ("The judiciary characterizes *parens patriae* as a prudential limitation to standing."); *Hanford Challenge v. Moniz*, 218 F. Supp. 3d 1171, 1178 (E.D. Wash. 2016) ("Parens patriae standing limitations are exactly that—a judicially self-imposed limit on the exercise of federal jurisdiction.") (citation modified); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1091 (S.D. Cal. 2018) ("[T]he Court assumes without deciding that *parens patriae* standing is prudential and not constitutional."). Because a significant number of courts treat the doctrine as prudential, and because the doctrine logically fits into the standing inquiry as a prudential consideration, the Court will follow the same course.

But the Court does not agree that the "quasi-sovereign interest" inquiry is contained in both the Article III inquiry and the prudential standing inquiry like Roku suggested. The State Attorney General must first overcome the prudential parens patriae hurdle. For two claims, Congress has overcome the hurdle for her by authorizing a parens patriae suit. For the others, she must demonstrate a quasi-sovereign interest separate and apart from residents' interests. Once past the prudential hurdle, she must then demonstrate for each claim that the residents on whose behalf she is bringing the suit have Article III standing. Thus, the Court

16

disagrees with Roku's suggestion that the quasi-sovereign interest inquiry happens at both steps. Rather, the Court looks to the quasi-sovereign interest at the prudential outset, then to Michigan residents' standing under Article III. *See Lacewell v. Off. of the Comptroller of the Currency*, 999 F.3d 130, 142 n.13 (2d Cir. 2021) (collecting case); *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001) (holding that "[the sovereign] still must allege injury in fact to the citizens they purport to represent as parens patriae"); *Utah Div. of Consumer Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1145 (D. Utah 2019) ("[A]s a matter of logic, it is clear enough that the mere assertion of a state interest, untethered from injury to the State's citizens, cannot support *parens patriae* standing—even if that interest might qualify as a quasi-sovereign interest if accompanied by such injury.").

In sum, the parens patriae doctrine generally and its relationship with Article III is fuzzy. There is disagreement about what parens patriae means, how it is applied, and when it should be applied. While both the Attorney General and Roku's arguments are well taken and are at least tangentially supported by precedent, the Court believes Roku's argument that parens patriae requires an "additional [prudential] hurdle" for the state is more in line with the logic of the federal courts' developed standing doctrines.

### ii. Parens Patriae Application

#### 1. COPPA Claims

As an initial matter, the parties agree that the Court need not analyze whether the State has parens patriae standing for the alleged COPPA claims. Roku conceded

that "Congress can override prudential standing requirements." ECF No. 31, PageID.335. In COPPA, Congress conferred on state attorneys general authority "*as parens patriae*, [to] bring a civil action on behalf of the residents of the State in a district court of the United States of appropriate jurisdiction." 15 U.S.C.S. § 6504 (emphasis added).[4] And as explained above, the Court agrees that such Congressional action affecting prudential considerations does not run afoul of Article III. *See Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews*, 210 F. App'x 469, 472 (6th Cir. 2006) (explaining that "because prudential limitations on jurisdiction are judicially self-imposed rather than constitutionally mandated, Congress has the power to waive prudential barriers by statute.") (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979)). Therefore, "[t]he AG need not satisfy prudential standing for COPPA, but must for the other claims." ECF No. 31, PageID.335. The Attorney General therefore has parens patriae standing to sue for counts one and two.

### 2.   Counts Three–Seven

Next, the Court will analyze whether the Attorney General has a quasi-sovereign interest for counts three through seven: (3) federal Video Privacy Protection Act (VPPA), (4) Michigan Preservation of Personal Privacy Act, (5) Michigan Consumer Protection Act (MCPA), (6) intrusion upon seclusion, and (7) unjust enrichment.

---

[4] Congress conferring a "parens patriae" authority on a State Attorney General is further evidence, or at the very least Congress' agreement, that parens patriae and quasi-sovereign interests are prudential considerations that Congress can override. *See In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d at 535 (finding that the Clayton Act "abrogated any prudential standing parens patriae requirements").

Two preliminary matters. First, count three is a federal claim brought pursuant to the Video Privacy Protection Act, 18 U.S.C. § 2710. The Court, however, will analyze the parens patriae analysis as to count three in conjunction with the rest of the state law claims as the State asserts the same interests and pursued the claim "to recover these liquidated damages, and any other appropriate relief, on behalf of Michigan residents." ECF No. 1, PageID.48. Furthermore, unlike COPPA, there is no statutory grant to a state attorney general to bring a VPPA claim. Rather, "[a]ny person aggrieved by any act of a person in violation of [the VPPA] may bring a civil action in a United States district court." 18 U.S.C.S. § 2710(c)(1).

Next, regarding count five, the Court must address whether the Michigan Legislature's act to allow the Michigan Attorney General to collect civil penalties for violations of the MCPA allows her to clear the prudential standing hurdle. *See* Mich. Comp. Laws § 445.905. Unlike Congress's conferral of parens patriae authority to a state attorney general in COPPA, a state legislature's grant to a state attorney general should not override the parens patriae federal standing requirements.[5] It is

---

[5] When Roku moved to dismiss the Attorney General's MCPA claim on the merits, it did *not* include the MCPA claim in its discussion of parens patriae. *See* ECF No. 11, PageID.94–98. Because prudential standing is not an affirmative defense that can be waived, however, the Court must still analyze the prudential standing hurdle that the Attorney General must clear to bring the MCPA claim in federal court. *See Cmty. First Bank v. NCUA*, 41 F.3d 1050, 1053 (6th Cir. 1994) ("Standing is not an affirmative defense that must be raised at risk of forfeiture. Instead, it is a qualifying hurdle that plaintiffs must satisfy even if raised sua sponte by the court. We find no authority for the plaintiffs' argument that prudential standing requirements may be waived by the parties. Recognizing a distinction between prudential and constitutional standing requirements in this context might give careless parties power to override congressional intent.").

well settled that Congress can override prudential considerations of the federal courts, but it is far from settled whether state legislatures may override federal prudential standing requirements.[6] Absent clear authority to the contrary, the Court will not permit a state legislature to usurp a federal court's authority to construe prudential standing requirements. *See Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 434 (S.D.N.Y. 2015) (discussing the relationship of federal court's standing requirements to state statutes). The Court will therefore require the Attorney General to clear the parens patriae prudential standing hurdle to bring the MCPA claim because the statute's grant of authority does not override federal prudential standing requirements.

As to a quasi-sovereign interest, the Court concludes that the Attorney General does not have parens patriae standing to bring claims three through seven because

---

[6] *Wright & Miller* notes that "[o]f course state rules that recognize standing need not be honored if Article III requirements are not met, although Article III concepts should be sufficiently flexible to recognize state-created rights to proceed in the public interest. If a clear case should appear in which standing would be recognized by state rules but denied by prudential federal rules, the federal court would have to choose between the general obligation to exercise diversity jurisdiction and its doubts as to the wisdom of enforcing this state claim of this particular plaintiff. It does not seem likely that the same choice should be made for all cases." 13B *Wright & Miller's Federal Practice & Procedure* § 3531.14 (3d ed. 2025). Here, it is not clear that the exact situation is afoot. The state of Michigan brought the MCPA claim. And it is well settled that a state is not considered a "citizen" for purposes of diversity jurisdiction. *Moor v. Alameda Cnty.*, 411 U.S. 693, 717 (1973) (citing *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894)). The Court would therefore not have diversity jurisdiction over the MCPA claim, but rather would be exercising supplemental jurisdiction, a circumstance in which the Court's obligation to hear claims is not unflagging. *See* 28 U.S.C. § 1367(c). But even if supplemental jurisdiction raised the same considerations discussed by *Wright and Miller*, the Court would still be hesitant, given the federalism concerns noted above, to allow the Michigan legislature to override federal prudential standing requirements.

she did not demonstrate that the asserted quasi-sovereign interest affects the State's residents *in general,* outside of particular Roku users. The Attorney General clarified in supplemental briefing that she asserted "at least three distinct quasi-sovereign interests" including "(1) 'ensuring fair business conduct in the State,' (2) 'preventing widespread privacy violations within Michigan,' and (3) 'preventing harm to the privacy of children in particular.'" ECF No. 32, PageID.355–356 (quoting ECF No. 1, PageID.130–131)

In each case, to determine whether there is a separate quasi-sovereign interest, courts look at the number of people affected, whether the defendant's actions harm a distinct group of people or the state populace in general, and whether it is the type of harm that the state would address through legislation. *See Chapman*, 940 F.3d at 305. "*Snapp* provides that although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Chapman*, 940 F.3d at 306 (citation modified). In *Snapp*, the actual violations had the indirect effect of stigmatizing Puerto Rico/Puerto Ricans generally and treating the territory (and its citizens) as inferior. *See Snapp*, 458 U.S. at 607–09.

Here, even considering indirect effects, nowhere in the complaint did the Attorney General allege that Roku's actions affect residents of Michigan *in general*— either directly or indirectly—rather than merely all *Roku users*. The Attorney General's asserted interest to protect Michigan citizens' privacy from potential illegal

21

data collection and sharing might look like a health-and-wellbeing interest separate from citizen's personal privacy concerns. *See Ideal Horizon*, 2024 WL 4351650, at *11 (explaining that "a state does have a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general"). In a footnote in its response brief, the Attorney General argued that Roku collects data from children in the home, visitors to the home, as well as registered users. ECF No. 16, PageID.132. Even still, she did not demonstrate an injury to the citizens of Michigan "in general." *See Snapp*, 458 U.S. at 607. To be sure, the state alleged that Roku is in widespread use by Michiganders. *See* ECF No. 1, PageID.2 (alleging that Roku is used by nearly half of American households). But as Roku correctly argued, the proper inquiry is the number of Michigan residents, outside of the distinct group of Roku users, who were *harmed*, and not merely the number of residents who *use* Roku. *See* ECF No. 31, PageID.336.

Merely asserting that the State has an interest in protecting the health and welfare of its citizens and citing their privacy interests cannot automatically demonstrate a quasi-sovereign interest. The Court is especially hesitant to extend parens patriae standing to the State for state law claims that its citizens could bring themselves considering the Supreme Court's cautionary instruction in *Snapp* that the doctrine "formulated so broadly . . . risks being too vague to survive the standing requirements of article III." 458 U.S. at 602.

The Court now looks to whether the injury is one the State would likely redress through legislation. *See Chapman*, 940 F.3d at 305. Here, the State pointed to privacy

legislation generally that "the Michigan legislature has pursued legislation to address data collection practices by large tech companies," and then specifically noted that the Michigan Personal Data Privacy Act, "would address much of the conduct challenged here." ECF No. 16, PageID.132. But pointing to existing and proposed privacy legislation generally does not demonstrate that the State meant to address Defendant's specific conduct. Rather, absent an "inclination to pass targeted legislation to address one particular company's questionable practice" the Court will not find it "likely" that the State would address the problem through legislation. *See Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 750 (N.D. Ohio 2011). And requiring specificity in the present context makes sense: if a plaintiff could point to legislation, generally, on any related topic, the State would almost always be conferred parens patriae standing. And that principle cannot be sustained because courts have consistently said that the parens patriae is a narrow doctrine. *See Snapp*, 458 U.S. at 600–01.

Even if the inquiry only required a Court to assume the state "would, if it could, address the issue through its sovereign law-making powers," *Chapman*, 940 F. 3d at 305 (citation omitted); *see* ECF No. 32, PageID.356, the Court is not convinced the state would address specific alleged violations *in this case*. According to the Attorney General's theory, Roku's conduct is redressable through COPPA, federal and state statutory claims, and common law tort claims. It is not clear to the Court why the state legislature would attempt to specifically address Roku's conduct through

legislation rather than through private litigation that any affected resident of the state could bring on his or her own.

Finally, the Court will address a few of the cases the Attorney General relied upon to establish a quasi-sovereign interest. First, in *N.M. ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103 (D. N.M. 2020), the district court concluded that the Plaintiff had a quasi-sovereign interest "in the health and welfare of the children of New Mexico" and could bring an intrusion on seclusion claim against a mobile game developer. *Id.* at 1124. The case involved COPPA as well as state law claims by the state proceeding parens patriae. But the non-binding opinion contained a mere four paragraphs of analysis on the standing question. And it lacked any discussion of how or why the asserted quasi-sovereign interest was separate from the privacy interests of the particular residents of New Mexico. Moreover, the one case cited by the district court for the position that states may pursue privacy tort claims under the parens patriae doctrine was a Minnesota intermediate state appellate court opinion about arbitrability in parens patriae suits. *Id.* (citing *State ex rel. Hatch v. Cross Country Bank, Inc.*, 703 N.W.2d 562 (Minn. Ct. App. 2005)). The Court is not compelled to follow *Balderas*' lead.

Second, in *Skrmetti v. Ideal Horizon Benefits*, the Kentucky and Tennessee Attorneys General filed suit on behalf of their citizens against a solar lender for violations of numerous state and federal consumer protection laws. 2024 WL 4351650, at *2 (E.D. Tenn. Sept. 30, 2024). The court said the states' quasi-sovereign

interest in "preventing fraud and deception within their borders" "exceed[ed] the interests of the particular residents who were actually defrauded." *Id.* at \*11.

The Court declines to follow the case for two reasons. First, the court there was satisfied that the fraud alleged affected the economic wellbeing of citizens. Such an interest was not alleged here. Second, the court did not explain how or why the states' interest was separate, other than concluding that "they would like to prevent [their citizens] from being defrauded." *Id.* And the problem the Court sees with *Skrmetti's* result highlights a broader issue: the Court must heed instruction from the *Snapp* court that, if courts are not careful, the parens patriae doctrine risks becoming nothing more than a box checking exercise. As the Attorney General asks the Court to do here, the Court in *Skrmetti* took a fraud problem caused by specific Defendants and concluded that somehow the states' interest was separate and broader than the interest of residents who were actually affected by Defendants actions. *See id.* at \*11.

Applied to other situations, the logic flounders. When people slip and fall on a dangerous, hidden object at a business site, that business may be liable in tort to the injured individuals. Because a state has an interest in keeping its residents safe at businesses, however, a state could argue that the accidents impact the "health and well-being" of its citizens and try to assert its quasi-sovereign interest and take residents' damages claims for itself. But parens patriae standing must have some limiting principle. And the Court doubts that a state can step in as parens patriae to litigate a series of slip-and-fall claims in federal court. Thus, for the doctrine to have any limits, there must be a separate interest requirement with actual teeth.

*Snapp* and *Chapman* set forth the types of limits the Court must follow. *See Snapp*, 458 U.S. at 607; *Chapman*, 940 F.3d at 305. *Chapman* and *Snapp*'s requirement that a state have a quasi-sovereign interest makes sense in light of the history of the modern parens patriae doctrine. Courts in the United States historically found an "additional sovereign or quasi-sovereign interest" necessary to enjoin public nuisances, in part because suits for personal injuries "would be wholly inadequate and disproportionate remedies." *See* 17 *Wright & Miller's Federal Practice & Procedure* § 4047 (3d. ed. 2025) (quoting *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)); *see also Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (noting that a suit to prevent air pollution is "for an injury to it in its capacity of quasi-sovereign"); *New York v. New Jersey*, 256 U.S. 296, 301–02, (1921) (finding that New York was a proper plaintiff to enjoin sewage dumping in the New York Bay).

The instant case is more similar to *Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 749 (N.D. Ohio 2011) in which a neighboring district court reasoned that an injury to Ohio homeowners with a mortgage from GMAC was only an injury to an "identifiable group of residents." The court went on to note that the relief sought "would be welcome news for any GMAC mortgagor about to lose his or her home . . . but of little interest to most other Ohio residents." *Id.* Here, the Attorney General sued "to put a stop to Roku's illegal data collection and disclosure practices." ECF No. 1, PageID.3. And most of the causes of action laid out in the complaint are those that individual Michigan residents could bring on their own. Like the Ohio residents in *GMAC Mortgage,* non-Roku users would have little interest in the outcome of the

litigation here. And, potentially even worse for Roku users themselves, they would likely be precluded from bringing their own claims and collecting the damages owed to them if the Attorney General could proceed on the state law claims parens patriae. *See e.g. In re Certified Question from U.S. Dist. Ct. for E. Dist. of Mich.*, 465 Mich. 537 (2002).

At bottom, with the exception of the MCPA claim, individual plaintiffs could bring the claims in this case themselves. Although the Court recognizes the dearth of authority and inconsistent guidance on parens patriae standing, based on the foregoing, the Attorney General did not establish a quasi-sovereign interest. While the Attorney General asserted an admirable interest in protecting the privacy of Michigan residents, she did not demonstrate that the State's interest in protecting privacy was separate and apart from the citizens' own interests.

### b. *Sovereign Interest*

In *Snapp*, the Supreme Court distinguished between quasi-sovereign interests and sovereign interests. *See* 458 U.S. at 602. Sovereign interests, as opposed to quasi-sovereign interests, give a state standing to "create and enforce a legal code." *Id.* at 601. Because the State alluded to its sovereign interest in the briefing but did little to develop an argument about it, the Court requested supplemental briefing on whether the Attorney General had standing based on its sovereign interest in enforcing its own laws. ECF No. 30, PageID.318–320. The Attorney General then asserted that even if she had no quasi-sovereign interest, she would still have standing because of "Michigan's sovereign interest in enforcing its law." ECF No. 32,

27

PageID.360. Roku, however, argued that a mere violation of state law does not injure the state's sovereign interest. ECF No. 31, PageID.340. Rather, Roku argued, a state's sovereign interest is implicated when it is "hindered from enforcing its laws in some appreciable way." *Id.* (quotations omitted).

Roku is correct. The mere violation of state law does not give a state the ability to take one (or more) of its citizens' claims and assert it in federal court. *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023) (explaining that "what has traditionally counted as an injury to a sovereign interest does not include every act of disobedience to a state's edicts"); *see also Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020) (noting that lawbreaking "does not by itself injure the government in an Article III way"). Our system of federalism allows both the federal government and the states to act as dual sovereigns, each with its own courts. *See Gamble v. United States*, 587 U.S. 678, 685–90 (2019) (discussing federalism). But to confer standing in federal court, a sovereign interest must relate to the state's *ability* to enforce state law—like when the federal government prohibits a state from enforcing its duly enacted law. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (explaining that a state "suffers a form of irreparable injury" if it cannot effectuate "statutes enacted by representatives of its people") (citation omitted).

Here, the state's asserted sovereign interest—enforcing its own privacy and tort laws—has nothing to do with the *ability* of the State to enforce its own laws.

Indeed, the Court sees no reason why Michigan cannot hale Roku into Michigan courts and assert the very claims at issue here.[7]

## II. Jurisdictional Standing

After the prudential standing analysis, only the two COPPA claims remain. And the Court must assure itself that the Attorney General has jurisdictional standing to bring those claims. As noted above, the prudential analysis concerned whether the Attorney General could bring the claims on behalf of the citizens of Michigan. The Attorney General cleared that bar through congressional authorization, so the Court will turn to whether the Michigan citizens suffered an injury in fact that is fairly traceable to Roku's conduct and redressable by a favorable decision of the Court. *See Lujan*, 504 U.S. at 560–61; *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001) (holding that "[the sovereign] still must allege injury in fact to the citizens they purport to represent as *parens patriae*").

---

[7] The Court does have some concern about quashing or diminishing the sovereign interest theory that supports litigation initiated by the states. Closing the courthouse door to states attempting to vindicate their own state law forces parties to litigate similar issues in two forums at the same time. Simultaneous litigation is almost always a poor use of government resources, and it frequently raises nettlesome preclusion issues. In addition, the present case is distinguishable from *Saginaw County* (and *Harrison*) in one key respect: it seeks money damages—and not just declaratory relief. As a result, the present case does not involve the same standing concerns as might a pre-enforcement challenge about "a potential future application" of a law. *Saginaw Cnty.*, 946 F.3d at 956. To the contrary, Michigan is arguably trying to enforce its law here by litigating the lawsuit to a final judgment. Nevertheless, because *Saginaw County* said that the mere violation of a law "does not by itself injure the government in an Article III way," *id.*, the Court reluctantly finds that Michigan's sovereign interest in the enforcement of Michigan law is not sufficient for sovereign interest standing to bring the present claims in federal court.

29

COPPA gave the Michigan Attorney General parens patriae standing to sue for violations of the statute. While Congress may confer prudential standing, it "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)). In other words, the Attorney General must still show a concrete injury that exists apart from the statutory violation.

To that end, courts must assess "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)). Intangible harms like "disclosure of private information" and "intrusion upon seclusion" can be concrete. *Id.* at 425. COPPA largely codifies children's privacy rights and is closely aligned with the historical, common-law privacy causes of action. *See In re Tiktok, Inc., Minor Priv. Litig.*, No. MDL 3144, 2025 WL 3628598, at *11 (C.D. Cal. Nov. 5, 2025); *see also D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1192 (S.D. Cal. 2024) (finding that the California Invasion of Privacy Act codifies a right to privacy, the violation of which is sufficient for standing). To determine, then, whether the Attorney General alleged a concrete injury on behalf of the affected children, there must be a "close relationship" to a traditional harm recognized in American courts, though courts do not require an "exact duplicate." *TransUnion*, 594 U.S. at 433.

Roku argued that the Attorney General only alleged an injury that is "possible" and not actual and that she failed to show "anyone having . . . information handled in an actionable way." ECF No. 31, PageID.329. Because "Roku cannot link particular data with the individual from which it was collected—not a child, household member, guest, or even account holder"—Roku argued that there can be no Article III standing here. *Id.* at PageID.332. But Roku's arguments that the Attorney General could not identify any personally identifiable information, at this stage, fall short. The Attorney General's allegations, taken as true, are sufficiently detailed to establish a concrete injury to children in Michigan based on Roku's alleged collection of personal information.

First, most of Roku's standing argument on COPPA is that the Attorney General did not allege that Roku collects information that "identifies any actual person." *Id.* at PageID.332. Indeed, Roku argued that the Attorney General did not disclose personally identifiable information (defined under those statutes), and this was one of the arguments it made for why many of the state law claims and the VPPA claim should be dismissed *on the merits*. Here, however, the inquiry must focus on whether Plaintiff's COPPA claims establish Article III standing (injury in fact, causation, and redressability). And the Attorney General alleged that Roku collects children's personal information both from content outside and within the Kids and Family section on the Roku Channel, and that Roku allows third-parties to collect that personal information. ECF No. 1, PageID.15. The "personal information" allegedly collected and disclosed to third parties includes device identifiers, IP

addresses, browser cookies, account registration information, browsing history, "[p]recise geolocation," and visual and audio information from users. ECF No. 1, PageID.23–24.

The Attorney General specifically alleged that Roku impermissibly invaded children's privacy by collecting scores of information from their browsing history, precise locations, and audio files. Taking the allegations as true, and resolving inferences in favor of the Attorney General, the purported claims are sufficient to conclude that Roku's data collection practices could collect individually identifiable information. Unlike *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 65–66 (W.D. Pa. 2023), and *Saeedy v. Microsoft Corp.*, No. 23-cv-1104, 2023 WL 8828852, at *4 (W.D. Wash. Dec. 21, 2023), the complaint here alleged that children's precise locations, browsing history, account information, and audio information was collected and disclosed to third parties. That type of personal information certainly encompasses the common law understanding of the right to privacy and the tort of invasion of privacy, namely: "the individual's control of information concerning his or her person." *Salazar v. Paramount Glob.*, 133 F.4th 642, 647 (6th Cir. 2025) (quoting *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)). Such allegations are enough to show an injury in fact. Because the Attorney General alleged that Roku's data collection practices caused the harm, the claimed harm is also traceable to Roku's conduct. Lastly, an award of injunctive relief and monetary damages against Roku would redress the injury. Thus, at this juncture, the

Court finds that Roku has alleged enough to satisfy Article III standing and may proceed with its COPPA claims.

## CONCLUSION

For the foregoing reasons, the Court will dismiss claims three through seven. The Attorney General's COPPA claims remain. The parties have been conducting limited discovery on claims one and two during the pendency of Roku's motion to dismiss. ECF No. 19. In a separate order, the Court will order submission of an updated joint discovery plan and set a scheduling conference.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendant's Partial Motion to Dismiss [11] is **GRANTED** and claims three–seven are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: March 31, 2026